# IN THE SUPREME COURT OF THE STATE OF DELAWARE

DAMIAN THOMAS, §
§ No. 521, 2017
Defendant Below, §
Appellant, §  Court Below—Superior Court
v. §  of the State of Delaware
§
STATE OF DELAWARE, §  Cr. ID No. N1505012411
§
Plaintiff Below, §
Appellee. §

Submitted: January 9, 2019
Decided:   March 26, 2019

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

## **O R D E R**

This 26th day of March, 2019, after careful consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    Following a Superior Court jury trial, Damian Thomas was convicted of first-degree murder, possession of a firearm during the commission of a felony, and carrying a concealed deadly weapon.  At a later bench trial,[1] Thomas was also found guilty of possession of a firearm by a person prohibited.  The Superior Court sentenced him to life in prison for the first-degree murder charge plus twenty years' incarceration for the remaining offenses.

---

[1] At the request of the parties, the Superior Court ordered a separate trial of the person-prohibited count.

(2) The charges and convictions arose out of the following events. On a mid-April evening in 2015, Etta Reid and her son, Deshannon Reid, were sitting on the front porch of their home on West 27th Street in Wilmington. Shortly thereafter, Damian Thomas joined the Reids, sitting in a porch chair beside Deshannon. After a brief conversation, Thomas left and walked toward Market Street.

(3) About five minutes later, Thomas returned to the porch, sat in the same chair next to Deshannon, and whispered in Deshannon's ear. Deshannon stood up and said, "Man, I told you I don't have anything for you."[2] Arguing, the two men left the porch and walked two houses down towards Moore Street. It appeared to Etta that the two men were arguing about drugs or money.

(4) Etta observed the two men walk towards the corner across Moore Street. Because there was a large group of people talking on the corner, Etta could not hear everything that was said. As Deshannon turned to cross the street opposite Thomas, Etta overheard people exclaiming, "No, [m]an, no."[3] Thomas pulled out a gun and shot Deshannon. After Deshannon fell, Thomas stood over him and shot him twice more before he fled through the parking lot of Pete's Pizzeria, located on the corner of 27th and Market Streets. According to the chief investigating officer,

---

[2] App. to Op. Br. A16 ("A__" hereafter).
[3] A17.

2

Detective Thomas Curley of the Wilmington Police Department, the shooting occurred at 9:44 p.m.

(5) Deshannon died three days later as a result of the gunshot wounds he sustained that evening.

(6) Police recovered several surveillance videos recorded near the scene, four of which are of particular relevance to Thomas's appeal. Three of the videos from Pete's Pizzeria depict arguably relevant events: (i) an individual in dark clothing walking along the north side sidewalk on 27th Street at 9:33 p.m., heading westbound from Market Street toward the scene of the shooting; (ii) an individual— also in dark clothing—walking on the north side sidewalk with two other individuals coming through the parking lot at 9:44 p.m., also heading in the direction of the crime scene; and (iii) an individual who was in front of the pizzeria at 9:44 p.m. and "react[ed]" as if he was "startled" as the incident occurred.[4]

(7) The fourth video from Crestview Apartments—where Thomas's girlfriend lived—shows Thomas entering the apartment building at 9:36 p.m. and signing in with the security guard. He then walked past the elevator doors and entered his girlfriend's apartment. He left her room after about thirty seconds, walked past the elevator doors and the security guard, and left the building at 9:38

---

[4] A40; *see also* Trial Tr. 86 (Sept. 13, 2017).

p.m.  At trial, Thomas did not contest that he arrived at and departed from Crestview Apartments in this manner and at these times.[5]

(8)    Approximately six minutes after Thomas left Crestview Apartments, police received a report of shots fired.

(9)    Another Wilmington police officer, Detective Puit, testified that the distance between the Crestview Apartments and the crime scene was approximately 350 feet.  Detective Puit walked the route at what he considered to be a normal pace, and it took him approximately a minute and a half.

(10)    In an effort to corroborate Etta Reid's testimony that Thomas left her porch after a short visit and conversation, the State—over Thomas's objection—asked Detective Curley whether, in his opinion, the persons seen in dark clothing in two of the pizzeria videos was Thomas.  Detective Curley opined that the person in one of the video clips, who was dressed in a dark jacket, blue jeans, and tan boots—just as Thomas was dressed in the Crestview video—was in fact Thomas.  And when the State asked about the person in one of the other pizzeria video clips,[6] Detective

---

[5] The State also introduced the Crestview sign-in logs from the Crestview Apartments lobby, which recorded that Thomas signed in at 9:36 p.m. and signed out at 9:38 p.m.

[6] We note that in certain instances it is difficult to discern which trial exhibits and video clips are the subject of certain witness's testimony from the record before us.  For instance, when defense counsel was cross-examining Detective Puit about the individual who appeared to "react to the incident" at 9:44 p.m., the record does not identify the exhibit under discussion, although we might infer that it is State's Exhibit 35.  Similarly, in the testimony at the heart of this appeal—Detective Curley's opinion that one individual is Thomas and another is not—the record does not indicate which portion of Exhibit 35 (the 9:33, the 9:40, or the 9:44 clip) is relevant for each opinion.  While

4

Curley noted that he was wearing "dark or black pants, and . . . a knit hat or his hair's a little bit longer on top, but definitely the pants are not blue jeans."[7]  Detective Curley then opined that this person was not Thomas.

(11)   In response to Thomas's objection to Detective Curley's identification testimony, the prosecutor downplayed the materiality of Curley's opinion. Nevertheless, in closing argument, the State highlighted the video evidence in service of its theory that Thomas used his brief absence from Etta Reid's porch to retrieve a gun from his girlfriend's apartment.

(12)   On appeal, Thomas argues that the Superior Court abused its discretion by allowing Detective Curley to offer his lay opinion identifying Thomas as the person depicted in one of the pizzeria surveillance videos.  Additionally, Thomas argues that the State did not present sufficient evidence to establish that he concealed a deadly weapon from the ordinary sight of another person.

(13)   We review the Superior Court's evidentiary rulings for abuse of discretion.  "A decision to admit testimony as relevant is within the sound discretion of the trial judge and will not be reversed absent a clear abuse of that discretion."[8] An abuse of discretion occurs when the trial judge "has exceeded the bounds of

---

this deficiency impairs our ability to provide a coherent statement of this case's factual background, it does not affect our legal analysis and conclusion.

[7] A52.

[8] *Stickel v. State*, 975 A.2d 780, 782 (Del. 2009).

reason in view of the circumstances or so ignored recognized rules of law or practice so as to produce injustice."[9]

(14) Under Delaware Rule of Evidence 701, if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (i) rationally based on the witness's perception, (ii) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (iii) is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[10] Rule 701 "permits a lay witness to testify about his own impressions when they are based on personal observation."[11] "The ultimate question of the identity . . . remains one for the jury to decide, and lay opinion testimony will not be helpful to the jury 'when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion.'"[12]

(15) Thomas argues that the detective's opinion was not based on his own perceptions but rather on his review of the same videos and evidence available to the jury. Admission of this opinion, according to Thomas, led to a violation of his right to a fair trial "as it invaded the province of the jury and implicitly bolstered the credibility of the State's discredited witnesses."[13]

---

[9] *Id.*
[10] D.R.E. 701.
[11] *Cooke v. State*, 97 A.3d 513, 547 (Del. 2014).
[12] *Id.*
[13] Op. Br. 9.

(16) The State counters that the challenged testimony was based on Detective Curley's perception and helpful to the jury because he reviewed the video several times and had also met Thomas prior to trial.

(17) We have serious reservations about the admission of this type of identification testimony. It is unclear to us how the testimony of a police officer— or any other witness without a particular expertise in comparing a videographic representation of a person with a suspect or defendant—would be helpful to the factfinder in resolving an identification issue. And here, neither the Superior Court in its evidentiary ruling nor the State in its briefing offered a satisfactory answer to that question.[14] Nevertheless, under the particular facts of this case, we stop short of finding an abuse of discretion in the Superior Court's evidentiary ruling.

(18) First, it was the defense that initially elicited testimony touching upon the investigating officers' ability to identify individuals depicted in the different videos retrieved from the pizzeria. Particularly, defense counsel asked Detective Puit questions that were designed to show that a viewer of three of the relevant video clips— the clips at 9:33 and 9:40 showing the person in dark clothing walking toward the crime scene and the 9:44 clip showing a person reacting to the shooting—

---

[14] It also seems to us that condoning identification testimony of this sort could have untoward consequences. If the prosecution is permitted to sponsor such testimony, then it would only be fair to allow defendants to do the same. We envision a train of "identification" witnesses offering personal opinions untethered to any expertise whenever a trial involves the consideration of videographic, photographic, or other images that are not crystal clear.

7

might conclude that the persons appearing on each was the same individual and, presumably, not Thomas. This line of questioning called for the detective's opinion regarding the identity, though not the name, of the individuals appearing in the video clips. It therefore would not have been outside the bounds of reason for the trial judge to conclude that this line of questioning opened the door for the introduction of Curley's opinion that the 9:33 and 9:40 clips depicted two different subjects and that one of them was Thomas.[15]

(19) Second, we are not persuaded that Detective Curley's testimony constituted improper vouching for the other prosecution witnesses' credibility as Thomas argues. That the testimony, if accepted, supported the prosecution's theory of what Thomas did after he first left Etta Reid's porch, *i.e.*, he went to his girlfriend's nearby apartment and retrieved a gun, does not transform it into improper vouching, which typically "occurs when the prosecutor implies personal superior knowledge beyond what is logically inferred from the evidence at trial."[16] Here, Detective Curley's opinion was explicitly linked to evidence that the jury

---

[15] *Smith v. State*, 913 A.2d 1197, 1239 (Del. 2006) ("Generally, when a party opens up a subject, he cannot object if the opposing party introduces evidence on the same subject. This is true even though the evidence developed on cross-examination would have been inadmissible if the cross-examiner had offered it directly into evidence. The rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage. Yet, the doctrine of opening the door is limited to testimony that might explain or contradict the testimony offered by the opposing party on direct examination; it cannot be 'subverted into a rule for injection of prejudice.'") (quoting *Tucker v. State*, 515 A.2d 398, 1986 WL 17446 (Del. 1986) (Table)).

[16] *Kirkley v. State*, 41 A.3d 372, 377 (Del. 2012).

viewed during the trial—the video clips. Moreover, he did not offer any opinions on the credibility of other prosecution witnesses. Whatever one might say about the helpfulness of Detective Curley's lay opinion that Thomas was the person depicted on one of the videos he watched, that opinion was not vouching as we have used that term.

(20) But even if the detective's opinion should not have come in, the admission of his testimony was harmless and therefore does not warrant reversal. "An error in admitting evidence may be deemed to be 'harmless' when 'the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.'"[17]

(21) The evidence against Thomas was considerable and, even without Detective Curley's opinion testimony, more than sufficient to support Thomas's conviction. Two other eyewitnesses—Etta Reid and Leantaye Cassidy—testified that they saw Thomas shoot Deshannon Reid before he fled through the parking lot.[18] Moreover, Thomas's former cellmate, testified that Thomas told him that he retrieved a gun and shot Deshannon following a drug-related argument. Lastly, the jury had the ability to review on its own the content of the surveillance videos and

---

[17] *Cooke*, 97 A.3d at 547.

[18] A third purported eyewitness was apparently discredited when the defense introduced evidence that she was incarcerated on the night of the murder. The State countered that the evidence suggested that the witness could have been on work release at the relevant time, but the Superior Court, in the absence of evidence supporting this contention, precluded the State from arguing that point to the jury.

determine whether it was Thomas on the tapes. This evidence—coupled with the facts that Thomas fled from Delaware and his girlfriend of seventeen years, remained at large for a year, and admitted that he was wanted for murder in Delaware when police apprehended him in New Jersey in 2016—is sufficient to sustain Thomas's conviction. Thus, even if the Superior Court erred in admitting the detective's opinion, such error was harmless and does not warrant reversal.

(22) Finally, Thomas contends that the State failed to present sufficient evidence that Thomas concealed a gun from the ordinary sight of another person because "none of the videos presented . . . provided any hint that there may be a gun hidden on Thomas"[19] and that "[t]he witnesses . . . did not see a gun but saw/heard shots."[20]

(23) When an appellant has unsuccessfully moved for a judgment of acquittal in the trial court, we review a claim of insufficient evidence *de novo* to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt.[21] But Thomas did not move for a judgment of acquittal in this case. Absent such a motion, the claim is waived. We may excuse waiver if we find that the trial court

---

[19] Op. Br. 23.
[20] Reply Br. 7.
[21] *Neal v. State*, 3 A.3d 222, 223 (Del. 2010).

10

committed plain error.[22] Plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[23] We find no such error.

(24) "A conviction under Section 1442 requires proof of concealment."[24] Section 1442 provides that "a person is guilty of [carrying a concealed deadly weapon] when the person carries concealed a deadly weapon upon or about the person without a license to do so. . . ."[25] "The key to whether a concealed deadly weapon may be deemed to be 'about' the person should be determined by considering the immediate availability and accessibility of the weapon to the person."[26] This Court has adopted the majority rule requiring that "a concealed weapon be 'hidden from the ordinary sight of another person . . . [meaning] the casual and ordinary observation of another in the normal associations of life.'"[27] "A weapon may be concealed even though easily discoverable through routine police investigative techniques."[28]

---

[22] *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).
[23] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[24] *Robertson v. State*, 704 A.2d 267, 268 (Del. 1997).
[25] *Gallman v. State*, 14 A.3d 502, 504 (Del. 2011) (*quoting* 11 *Del. C.* § 1442).
[26] *Id.*
[27] *Robertson*, 704 A.2d at 268.
[28] *Id.*

11

(25)   The State may prove its case with direct or circumstantial evidence.[29] Here, the circumstantial evidence suggests that Thomas retrieved a gun from his girlfriend's apartment. Given that no gun was visible on the video depicting Thomas leaving the apartment, it can be fairly inferred that he had concealed the gun.   This inference is buttressed by Cassidy's testimony that she saw Thomas "reach for his waistband, reach his arm out . . . and shoot DeShannon."[30]   Cassidy further stated that she knew Thomas shot DeShannon Reid because she "heard the gun [go] off" and saw "the fire come out."[31]   Viewing this testimony in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that the gun had been concealed from the ordinary sight of another person before Thomas shot Deshannon.   This would suffice to defeat Thomas's insufficient evidence claim even had he not waived it.   *A fortiori*, the Superior Court's failure to enter a judgment of acquittal *sua sponte* was not plainly erroneous.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[29] *Davis v. State*, 706 A.2d 523, 525 (Del. 1998).
[30] A28.
[31] *Id.*

12